IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ODELL WRAY,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SCHOOL DISTRICT OF** | : | |
| **PHILADELPHIA,** | : | **No. 14-5886** |
| **Defendant.** | : | |

<u>MEMORANDUM</u>

**Schiller, J.**                                                                 **February 4, 2016**

Odell Wray sued his former employer, the School District of Philadelphia ("the School District"), alleging racial discrimination under Title VII of the Civil Rights Act of 1964. Specifically, Wray claims that he was fired because the school principal disapproved of his interracial relationships.

The School District has filed a motion for summary judgment, asserting that Wray cannot establish proximate cause under *Jones v. Southeastern Pennsylvania Transportation Authority*, 796 F.3d 323 (3d Cir. 2015), between the principal's alleged animus and Wray's termination. For the following reasons, the motion is granted.

I.     **BACKGROUND**

Wray was a custodial assistant for the School District from August 14, 1992, until he was fired on April 23, 2013. (Compl. ¶ 5.) At the time of his termination, Wray was assigned to Motivation High School, where Yvonne Jones was the principal. (*Id.* ¶¶ 25-26.) Wray, an African-American man, claims that Jones, an African-American woman, bullied him for dating one of the white teachers. (*Id.* ¶¶ 26-46.)  According to the Complaint, Jones told Wray that "jungle fever" was not allowed at school. (*Id.* ¶ 30.) Jones allegedly told others that Wray was

walking around with a target on his back. (*Id.* ¶ 43.) On November 16, 2011, Jones called Wray to her office and falsely accused him of leaving work during his shift. (*Id.* ¶ 45.) After admitting her mistake, Jones allegedly told Wray that he might avoid these confrontations in the future if he stuck to his "own kind." (*Id.* ¶ 45.)

Wray entered the school building on November 28, 2011, at approximately 7 p.m., with a female companion named Cassandra Hendricks whom Philadelphia Police Officers Glenn Fedon and Maribelle Quiles recognized as a local prostitute. (Mot. for Summ. J. Ex. 1 [Police Report].) When Wray and Hendricks exited the building about twenty-five minutes later, Officers Fedon and Quiles stopped them for questioning. (*Id.* Ex. 2 [Dep. of Quiles].) Wray told the officers that he had returned to the school to retrieve his debit card and to allow Hendricks to use the bathroom. The police questioned Hendricks separately. (*Id.*) According to Officer Quiles, Hendricks admitted that she and Wray had had sex inside the school building, and that this was not the first time they had done this. (*Id.*) Wray disputed Hendricks's account and maintained that he was just driving her home.

The following day, on November 29, 2011, the two police officers returned to the school to inform Jones about Wray's actions. (*Id.* Ex. 14 [Investigative Report of Cook].) Jones notified Tom Wilson, one of Wray's supervisors, about the police report, and she asked that Wray be transferred. (*Id.* Ex. 7 [Mem. of Wilson].) Jones also contacted School Police Officer Johnnie Lampkins, who located surveillance footage showing Wray and Hendricks inside the building. (*Id.* Ex. 15 [SRC Findings of Fact].) Officer Lampkins sent a report to the Office of School Safety, which initiated a formal investigation led by Antoinette Cook, a retired police detective. Cook submitted an investigative report dated January 10, 2012, to Chief Inspector Myron

Patterson, which referred to the police report and surveillance footage as evidence against Wray. (Investigative Report of Cook.) This report was not addressed to Jones (*Id.*)

On November 30, 2011, Wray's supervisor, Tom Wilson, wrote a memorandum to the facilities coordinator, Matt Melady, recommending a hearing to contemplate Wray's dismissal. (Mem. of Wilson.) That same day, Melady wrote a memorandum to Tracie Gardner, a disciplinary hearing officer, to recommend "a[n] immediate hearing and to request . . . the termination of services of Mr. Wray." (*Id.* Ex. 12 [Mem. of Melady].) The memorandum included a chronological index of Wray's disciplinary history, which, according to Melady, showed "continuous insubordinate and disrespectful behavior." (*Id.*)

On December 29, 2011, Gardner held a hearing to discuss the charges against Wray, namely trespassing, inappropriate behavior, and allowing an unauthorized guest to enter the school building. (*Id.* Ex. 13 [Mem. of Gardner].) On January 12, 2012, Acting Hearing Officer Richard Cecchine conducted a second hearing on the matter. (SRC Findings of Fact.) On January 19, 2012, the School District advised Wray that it would recommend his immediate termination to the School Reform Commission ("SRC"). (Answer ¶ 55.) Wray appealed the School District's recommendation for termination, and, on October 31, 2012, SRC Hearing Officer William Capresseco held a hearing on the appeal. (*Id.* ¶ 58.) Jones did not participate in any of these hearings. (Mem. of Gardner; SRC Findings of Fact.) Relying on Capresseco's factual findings and legal conclusions, the SRC fired Wray on April 18, 2013. (Answer ¶ 59.)

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see*

*also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 247. Once the moving party has met its burden, the nonmoving party must go beyond the pleadings to set forth specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "Such affirmative evidence— regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams v. Borough of W. Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

A court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). If the nonmoving party's evidence "is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## III.    DISCUSSION

Title VII of the Civil Rights Act forbids employers from making adverse employment decisions, such as termination decisions, based on race. 42 U.S.C. § 2000e-2(a)(1). Jones did not

make the decision to fire Wray, because she lacked such authority. Moreover, Jones was not present at any of the three disciplinary hearings conducted by the School District to discuss the charges stemming from Wray's conduct with a female companion on school grounds. Instead, Jones reported Wray's actions to his supervisors, who initiated the termination procedures. (Mem. of Wilson.) Wray's discrimination claim relies on Jones's decision to report these actions to Wray's superiors. (Resp. to Mot. for Summ. J. at 3.)

The legal basis for Wray's discrimination claim is the "cat's paw" theory of liability.[1] The cat's paw theory permits an employee to "hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011). There are two requirements for a successful cat's paw claim: (1) a supervisor who is not the ultimate decisionmaker must "perform[] an act motivated by [discriminatory] animus that is intended . . . to cause an adverse employment action," *Staub*, 562 U.S. at 422; and (2) "that act [must be] a proximate cause of the ultimate employment action," *Id*. Viewing the facts in the light most favorable to Wray, this Court will assume here that Jones's decision to report Wray included a discriminatory animus toward Wray and was intended to get him fired. Nevertheless, Wray's claim fails on the second prong, because he cannot establish proximate cause.

The Third Circuit's decision in *Jones v. Southeastern Pennsylvania Transportation Authority*, 796 F.3d 323 (3d Cir. 2015), illustrates the challenges of establishing proximate cause under a cat's paw theory. In *Jones*, the plaintiff brought an action under Title VII alleging

---

[1] The term "cat's paw" is derived from a fable in which "a monkey induces a cat . . . to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 415 n.1. Here, Wray argues that Jones induced the School District to fire him; the School District consequently is burned by the present lawsuit.

discrimination after she was fired for timesheet fraud. While there was no evidence that the employer's decision to terminate her was discriminatory, the plaintiff asserted a cat's paw theory of liability, alleging that her supervisor, Alfred Outlaw, harbored a discriminatory animus that influenced the termination process. According to the plaintiff, Outlaw had sexually harassed her in the past, and she had filed a complaint against him. When Outlaw discovered evidence that the plaintiff had committed timesheet fraud, he seized on the opportunity to retaliate by reporting this fraud to the inspector general. The court held that the plaintiff could not recover without proximate cause, "[e]ven if . . . Outlaw's accusation was based on animus," and even if "Outlaw's conduct was a but-for cause of Jones's termination, as she may never have been fired for timesheet fraud had Outlaw not reported the matter." *Jones*, 796 F.3d at 330 (citing *Staub*, 562 U.S. at 419).

In *Jones*, the court held that there was no proximate cause between Outlaw's discriminatory animus and the plaintiff's termination, because the authorities conducting the investigation did not merely adopt Outlaw's accusations or rubberstamp his recommendations. *Id.* at 331 ("[P]roximate cause will not exist when the employer does not rely on the supervisor's biased report in taking the ultimate adverse action."). On the contrary, the authorities in that case conducted an independent investigation. The court noted that the decision to terminate the plaintiff was "based on an investigation independent from Outlaw." *Id.* There was "no evidence that Outlaw influenced the . . . investigation or SEPTA's termination decision beyond getting the ball rolling with his initial report of timesheet fraud." *Id.*  Finally, the Third Circuit distinguished *Jones* from *McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011), which had held that a cat's paw theory of liability could apply to Title VII complaints. The court stated that "this case is a far cry from *McKenna*, where there was no evidence that the employer relied on anything

6

besides the allegedly biased supervisor's say-so in deciding to terminate the employee." *Jones*, 796 F.3d at 331 (citing *McKenna*, 649 F.3d at 179).

In this case, the School District has furnished undisputed evidence that the decision to terminate Wray was based on the results of an investigation that was sufficiently independent from Jones to preclude the jury from finding proximate cause as a matter of law. Rather than rubberstamp Jones's account of the facts, the School District commissioned an independent investigation of the November 28, 2011 events and held three hearings conducted by three different hearing officers at which Wray was present and Jones was absent. In making its final determination, the SRC considered as evidence the police report, Investigator Cook's independent report, surveillance footage placing Wray and Hendricks at the scene, and Wray's admissions and contradictions at the hearings. (SRC Findings of Fact.) The written findings of fact adopted by the SRC did not mention Jones. (*Id.*) Wray admitted that he permitted an unauthorized guest to enter the school, which was a violation of School District policy. (*Id.*) Additionally, a hearing officer noted that Wray was unable to identify his female companion by name or state where she lived or what she did for a living, even though Wray claimed they were friends and that he was driving her home. (*Id.*) In its decision to terminate Wray, the School District also considered his prior disciplinary history, which had resulted in two suspensions, including a ten-day suspension for a physical altercation with a student, after which both parties required medical attention. (*Id.*)

There is no factual basis for Wray's assertion that "it appears to be undisputed that the decision-makers of Plaintiff's termination relied on facts provided by Principal Jones." (Resp. to Mot. for Summ. J. at 1.)    Jones may have gotten the ball rolling on Wray's termination by sharing the police report with his supervisors. Indeed, Jones's decision to share this information

may have been the but-for cause of Wray's termination. However, the SRC's decision to terminate Wray was based on many types of evidence, such as surveillance footage, that were independent from Jones's sphere of influence. Even if Jones's recitation of the events to Wray's supervisors or the investigators was embellished, as Wray alleges, the record simply lacks sufficient evidence for a jury to find that the SRC blindly adopted the facts reported by Jones. Therefore, as a matter of law, Jones did not proximately cause Wray's termination, and the School District is entitled to summary judgment.

IV.     **CONCLUSION**

In reviewing the School District's motion for summary judgment, the Court assumed that Jones was biased against Wray. However, the existence of a supervisor with a discriminatory animus does not make an employee immune from termination. The School District terminated Wray based on a finding that he had sex with a prostitute on school grounds, and based on the cumulative impact of this incident with prior infractions. This Court does not need to determine the accuracy of these findings. It is sufficient that the School District reached its decision on the basis of an investigation and series of hearings independent from any supervisor with a discriminatory animus. The School District's motion for summary judgment is granted. An order consistent with this Memorandum will be docketed separately.